Carrie M. Francis (020453)
Tim Lauxman (035222)
**STINSON LLP**
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
carrie.francis@stinson.com
tim.lauxman@stinson.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Rosalee Gonzalez,<br><br>    Plaintiff,<br><br>v.<br><br>US Human Rights Network, Inc.,<br><br>    Defendant. | Case No. _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Dr. Rosalee Gonzalez, by and through undersigned counsel, for her complaint against Defendant US Human Rights Network, Inc., alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff Dr. Rosalee Gonzalez is a resident of Maricopa County, Arizona living and residing in Arizona at all times material to this Complaint.

2. Defendant US Human Rights Network, Inc. ("USHRN") is a 501(c)(3) registered in Georgia.

3. USHRN holds itself out as a national network of organizations and individuals that advocate for the human rights of various communities.

4. From February 2018 through November 2019, Defendant employed Dr. Gonzalez as its Executive Director, and for the majority of that time, Dr. Gonzalez worked remotely from her home in Maricopa County.

5. As further alleged below, USHRN terminated Dr. Gonzalez because of her

race in violation of 42 U.S.C. § 1981; therefore, this Court has jurisdiction under 28 U.S.C. § 1331.

6. Venue is proper under 28 U.S.C. § 1391(b)(2).

**GENERAL ALLEGATIONS**

7. Upon information and belief, USHRN is a non-profit whose purpose is to facilitate the work of its members, individuals and organizations in the United States advocating for human rights.

8. In or about January 2018, USHRN terminated its employment of its Executive Director.

9. In February 2018, the then-Chair of USHRN's Board of Directors hired Dr. Gonzalez as USHRN's acting Executive Director.

10. Before taking the position as USHRN's acting Executive Director, Dr. Gonzalez was a member of USHRN's board, and has expertise in human rights advocacy and the United Nations' procedures.

11. Dr. Gonzalez is Indigenous/American Indian and Latino.[1]

12. Upon information and belief, USHRN's Executive Director immediately preceding Dr. Gonzalez was Black and/or African-American.

13. Upon information and belief, Dr. Gonzalez the first non-Black and/or African-American Executive Director in USHRN's then-15-year history.

14. Upon information and belief, despite USHRN's board purpose of supporting the human rights efforts in the United States, certain USHRN stakeholders believe USHRN's primary purpose is to serve Black and/or African-American individuals.

15. Upon information and belief, USHRN's founders decided to headquarter USHRN in Atlanta, Georgia, as a means to facilitate "Black institutional self-

---

[1] Dr. Gonzalez relies on these racial descriptors based on their usage by the United States Census Bureau. *See generally*, https://www.census.gov/quickfacts/fact/note/US/RHI425219.

2

determination."

16. After hiring Dr. Gonzalez and terminating her predecessor, USHRN was aware some of its members or former members, including a former USHRN board member, were complaining that USHRN was anti-Black leadership.

17. USHRN was concerned about those complaints, as well as certain stakeholders' concerns that USHRN has strayed from, as the stakeholders believed, its primary purpose of serving Black and/or African-American individuals, despite USHRN's actual broader purpose.

18. Around the same time, USHRN was in the process of nominating, recruiting, and selecting new board members.

19. Upon information and belief, USHRN typically considers race and other classifications protected under federal and Arizona law when selecting its leadership.

20. During the board-member selection process, USHRN explicitly considered the candidates' race, ethnicity, gender, national origin, and age.

21. Upon information and belief, two of the three candidates selected to become board members were Black and/or African-American.

22. Upon information and belief, those new Black and/or African-American board members included Dr. Vickie Casanova-Willis and Latosha Brown.

23. USHRN also elevated Marcia Johnson-Blanco and Lisa Crooms-Robinson to the Chair and Treasurer of its board, respectively.

24. Upon information and belief, Ms. Johnson-Blanco, who immigrated to the United States from Guayana, is Black, African-American, and/or the broader "People of African Descent" ("PAD").[2]

25. Upon information and belief, Ms. Crooms-Robinson is Black and/or

---

[2] PAD refers to persons "of African descent" regardless of their nationality or whether they are "descendants of the victims of the transatlantic slave trade or . . . more recent migrants." *See generally* Background, International Decade for People of African Descent 2015-2014, United Nations, https://www.un.org/en/observances/decade-people-african-descent/background (last accessed Aug. 20, 2020).

3

African-American.

26. Upon information and belief, beginning in the first half of 2018 through Dr. Gonzalez's termination in November 2019, four of USHRN's seven board members and two of its four executive committee members were Black, African-American, and/or PAD: Ms. Johnson-Blanco, Ms. Crooms-Robinson, Dr. Casanova-Willis and Ms. Brown.

27. During 2018, USHRN's board was tasked with searching for a permanent Executive Director.

28. Upon information and belief, USHRN's board failed to undertake a meaningful search for a permanent Executive Director.

29. Consequently, USHRN selected Dr. Gonzalez as its permanent Executive Director.

30. However, USHRN did not provide Dr. Gonzalez employee benefits of Dr. Gonzalez, in contrast to USHRN's historic practice with the former Black and/or African-American Executive Directors.

31. USHRN's misclassification of Dr. Gonzalez also violated USHRN's bylaws and employee handbook.

32. Upon information and belief, while serving as a board member, Dr. Casanova-Willis was also affiliated with a USHRN member that advocates on issues relating to Black and/or African-Americans, and has affiliations with similar organizations.

33. As Executive Director, Dr. Gonzalez was responsible for helping prepare, in cooperation with USHRN staff and various members, USHRN's official statements regarding human rights issues, as well as attending human rights conferences and similar events.

34. Those statements and events included those relating to topics concerning PAD and issues affecting those individuals.

35. On certain occasions, Dr. Casanova-Willis contributed to statements

4

prepared by USHRN and Dr. Gonzalez regarding PAD issues, and also interacted with USHRN's members and other stakeholders regarding PAD issues.

36. On one occasion, Dr. Gonzalez raised concerns that a non-USHRN-member organization had a non-PAD individual rely on a USHRN-prepared statement concerning PAD-issues, which had limited USHRN's ability to present its statement.

37. That non-USHRN-member organization informed Dr. Casanova-Willis of Dr. Gonzalez's concern because Dr. Casanova-Willis had provided USHRN's statement to the group.

38. Dr. Casanova-Willis became upset with Dr. Gonzalez and accused Dr. Gonzalez of assassinating her character, *i.e.* that of "an African descendant member/board member;" questioned whether Dr. Gonzalez could, because of her "ethnicity," advocate on PAD issues; and questioned why the "National Conference of Black Lawyers" (which is not the organization that Dr. Gonzalez was concerned about) would want to continue its involvement with USHRN.

39. Dr. Casanova-Willis is a past president of the National Conference of Black Lawyers.

40. Relatedly, USHRN staff drafted the statement discussed above after receiving input from USHRN stakeholders, including Dr. Casanova-Willis, and published the statement on its website.

41. After a USHRN stakeholder raised concerns that USHRN's published statement did not provide special mention of Descendants of Captive and Enslaved Africans in the U.S. ("DCAUS"), Dr. Casanova-Willis accused USHRN staff of "suppress[ing]" advocacy on issues specific to those groups, which troubled her because of her "own heritage."

42. Dr. Gonzalez defended the statement as "inclusive," assured Dr. Casanova-Willis that there was "no hidden agenda to promote or omit" certain groups' voices, and welcomed Dr. Casanova-Willis to continue sharing her thoughts and experience to better

5

communication on PAD-issues and with PAD stakeholders.

43. Dr. Casanova-Willis responded that Dr. Gonzalez's response was "unacceptable."

44. Then a PAD-individual and USHRN employee responded to Dr. Casanova-Willis's concerns: He stated that DCAUS-specific advocacy "is an 'America First' form of Xenophobia" that "violates the principle of Universality in the execution of Human Rights," and questioned whether DCAUS advocates even believed PAD should be a recognized classification of people, as well as what DCAUS-specific rights, distinct from the rights of all PAD, had been suppressed.

45. After Dr. Gonzalez terminated that USHRN employee with the board's approval, Dr. Casanova-Willis disavowed that his behavior was a valid basis for his termination.

46. Further, certain members of PAD advocacy groups became upset with the USHRN and Dr. Gonzalez for terminating that employee, raising concerns about USHRN's valuation of "Black political voices."

47. During the summer of 2019, USHRN's board discussed these events; notably:

    a. Dr. Casanova-Willis described Dr. Gonzalez's behavior as "racist" and believed that "Dr. Gonzalez" has "other priorities," and that there was a "[n]eed to stop the budding race war in the network."

    b. Ms. Brown noted "[b]lack leadership has been essential to the Network;" that the "needs of the Network should dictate what staff is doing;" that "something bold" was needed to "engage membership;" that this was a "[m]oment of redefining [the] network;" and questioned whether "Rosalee" was the "person to lead [the] network."

    c. Ms. Crooms-Robinson wanted "to avoid giving Rosalee a full contract and then figuring out it's a mistake."

6

48. On or about September 13, 2019, Salimah Hankins, a then-employee of USHRN, informed Dr. Gonzalez that Dr. Casanova-Willis had shared Dr. Gonzalez's email responses to Dr. Casanova-Willis regarding their disagreements on USHRN's appropriate position on PAD issues with Black and/or African-American stakeholders of USHRN.

49. Dr. Gonzalez complained of Dr. Casanova-Willis's treatment towards her to Ms. Johnson-Blanco.

50. Upon information and belief, neither Ms. Johnson-Blanco nor any other USHRN board member took action regarding Dr. Gonzalez's complaints.

51. Upon information and belief, in the fall of 2019, USHRN's board approached Ms. Hankins about succeeding Dr. Gonzalez.

52. Upon information and belief, Ms. Hankins is Black and/or African-American.

53. Upon information and belief, USHRN wanted Ms. Hankins to succeed Dr. Gonzalez, at least in part, because USHRN preferred its PAD stakeholders and believed replacing Dr. Gonzalez with a Black and/or African-American individual would benefit USHRN's relationship with PAD stakeholders, despite USHRN's broader purpose not being limited to PAD advocacy and USHRN knowing Dr. Gonzalez's termination would upset numerous stakeholders advocating on behalf of numerous groups.

54. Around this time, Ms. Hankins, while attending a PAD-related conference, informed other attendees that Dr. Gonzalez was "missing in action" at work and not being accountable to USHRN's members.

55. After Dr. Gonzalez's termination, USHRN appointed Ms. Hankins as its acting Executive Director.

56. On January 6, 2021, USHRN announced a new "Co-Chair" of its board of directors, Molefi Askari.

57. Upon information and belief, Mr. Askari had never before held a position

at USHRN.

58. Upon information and belief, Mr. Askari is Black and/or African-American.

59. Upon information and belief, Mr. Askari's career in human-rights advocacy has centered on PAD issues.

60. At some time after Dr. Gonzalez's termination, Dr. Casanova-Willis became secretary of USHRN's executive committee.

61. On February 22, 2021, USHRN announced Dr. Casanova-Willis as its "Co-Executive Director."

62. Upon information and belief, USHRN did not publically announce that it was seeking candidates for the "Co-Executive Director" position for which Dr. Casanova-Willis was hired.

63. On March 20, 2021, USHRN announced it was seeking candidates for the other "Co-Executive Director" position, and explained that the new co-executive director leadership scheme was designed to, *inter alia*, "institutionalize . . . membership leadership."

64. On April 12, 2021, in her new role as "Co-Executive Director" and speaking on behalf of USHRN at an international PAD conference, Dr. Casanova-Willis made a DCAUS-emphasizing statement along the lines of the statement she criticized Dr. Gonzalez for not supporting in the spring of 2019.

65. Dr. Casanova-Willis's statement, on behalf of USHRN and all of its members at the international PAD2 conference, included references to "these yet-to-be-United States" as the "belly of the beast," premised on harms done to "descendants of formerly enslaved Africans" through the "Transatlantic Slave Trade," and demanded "[r]eparations which are owed for *our* stolen labor and stolen lives." (emphasis added).

66. As of this time, USHRN has not appointed the second "Co-Executive Director."

**CLAIM 1: DISCRIMINATION BASED ON RACE/ETHNICITY**

67. Dr. Gonzalez incorporates all of the foregoing allegations as if set forth fully herein.

68. 42 U.S.C. § 1981 guarantees all "persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Such claims are generally analyzed under the same framework as claims under Title VII.

69. Dr. Gonzalez is of Indigenous/American Indian and Latino race and ethnicity.

70. Dr. Gonzalez was qualified for her position as USHRN Executive Director:

    a. USHRN hired her to serve as its Executive Director multiple times: First in an acting capacity, and then on permanent basis.

    b. Dr. Gonzalez was also a USHRN board member before being employed as USHRN Executive Director.

    c. Dr. Gonzalez had extensive experience advocating on behalf of communities' human rights and knowledge of United Nations processes and procedures.

71. USHRN has a history of favoring Black and/or African-American individuals, including:

    a. USHRN has only hired Black and/or African-American individuals as their Executive Director, with Dr. Gonzalez as the solitary exception.

    b. Upon information and belief, USHRN specifically considers a candidate's race when considering a candidate for a leadership position and has consistently chosen Black and/or African-American individuals to lead USHRN.

    c. Upon information and belief, each Black and/or African-American Executive Director was treated as an employee of USHRN.

    d. USHRN did not treat Dr. Gonzalez as an employee despite having the same duties as the preceding Black and/or African-American Executive

9

Directors, and USHRN denied Dr. Gonzalez the benefits of an employee.

  e. During Dr. Gonzalez's term as Executive Director, USHRN had a majority of Black and/or African-American individuals on its board and executive committee.

  f. USHRN board member Dr. Casanova-Willis thought that Dr. Gonzalez was not capable of advocating on behalf of PAD issues because of her "ethnicity."

  g. USHRN board members Dr. Casanova-Willis, Ms. Brown, and Ms. Crooms-Robinson openly discussed terminating Dr. Gonzalez to stop the budding "race war" and appease the PAD stakeholders that Dr. Casanova-Willis had helped incite against Dr. Gonzalez.

  h. Dr. Casanova-Willis condemned Dr. Gonzalez's response to Dr. Casanova-Willis's DCAUS advocacy but acted to shield a PAD employee when USHRN and Dr. Gonzalez relied on his hostile response to Dr. Casanova-Willis's DCAUS advocacy when terminating his employment.

  i. Upon information and belief, USHRN took no action to respond to Dr. Gonzalez's complaints about Dr. Casanova-Willis's behavior towards her.

  j. USHRN has favored Dr. Casanova-Willis despite her role in exacerbating concerns from PAD stakeholders, including appointing her to its executive committee and now is co-Executive Director.

  k. Upon information and belief, USHRN selected both Ms. Hankins and Dr. Casanova-Willis for their respective roles as interim Executive Director in November 2019 and Co-Executive director in February 2021 because, at least in part, they are Black and/or African-American.

  l. Upon information and belief, in January 2021, USHRN elected Mr. Askari, as its new Co-Chair of its board because, at least in part, he is Black and/or African-American.

   m. In April 2021, Dr. Casanova-Willis adopted the DCAUS-centric view espoused by the PAD stakeholder that raised concerns with Dr. Gonzalez in 2019, and Dr. Casanova-Willis personally identified with that DCAUS-centric position.

72. Upon information and belief, USHRN believed replacing Dr. Gonzalez with a Black and/or African-American Executive Director would remedy complaints that USHRN was anti-Black leadership and suppressing DCAUS and Black political voices.

73. Because of that belief and USHRN's preference, USHRN terminated Dr. Gonzalez because of her race and ethnicity, *i.e.* because she was not Black and/or African-American.

74. As a direct and proximate result of USHRN's conduct, as set forth herein, Dr. Gonzalez has suffered injuries and damages, including but not limited to, loss of past earnings and benefits, the loss of future earnings and benefits, all to her damage in an amount to be proven at trial.

75. USHRN's actions were carried out intentionally and with a conscious disregard to the interests of Dr. Gonzalez and specifically for USHRN's own self-interest, thereby exposing USHRN to liability for exemplary and punitive damages.

## DEMAND FOR JURY TRIAL

Dr. Gonzalez requests a jury trial with respect to all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Gonzalez requests judgment as follows:

(A) Awarding judgment in an amount to be proven at trial in Dr. Gonzalez's favor and against Defendant for all damages provided for under applicable law, including but not limited to the value of lost employee benefits; governmental benefits afforded to employees including student loan forgiveness; compensatory damages including lost wages; past and future wages and/or impairment of power to earn money; unreimbursed business expenses paid out-of-pocket by Dr. Gonzalez

CORE/3517074.0002/167991956.1

1  during her employment; and punitive damages;

2  (B)  Awarding Dr. Gonzalez pre and post-judgment interest as provided for by law;

3  (C)  Awarding Dr. Gonzalez her costs and attorney fees as provided for by law; and

4  (D)  Awarding Dr. Gonzalez such further relief as this Court deems just and proper.

5  RESPECTFULLY SUBMITTED this 23rd day of August, 2021.

**STINSON LLP**

By: */s/ Carrie M. Francis*
Carrie M. Francis
Tim Lauxman
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
*Attorneys for Plaintiff*